UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

        Plaintiff,

            **Report & Recommendation**
-against-          04-CR-637 (ERK)(JMA)

HUNGRIA CAMACHO,

        Defendant.
----------------------------------------------------------X

FILED JUL 5, 2005

Order

The recommendation of the U.S. magistrate judge is adopted.

s/Edward R. Korman

USDT 6/21/05

APPEARANCES:

> Roslynn R. Mauskopf
> United States Attorney
> Eastern District of New York
> One Pierrepont Plaza
> Brooklyn, NY 11201
> By: John A. Nathanson
>   Assistant United States Attorney
>
> David J. Goldstein
> Goldstein & Weinstein
> 888 Grand Concourse
> Bronx, New York 10451
> Attorneys for Defendant

**AZRACK, United States Magistrate Judge:**

On July 14, 2004, defendant Hungria Camacho was indicted for conspiring to import over four kilograms of cocaine into the United States from the Dominican Republic.[1] Defendant moves to suppress: (1) any and all physical evidence seized from the person of the defendant on May 9, 2004 upon the grounds that said evidence was obtained in violation of the rights afforded to defendant by the Fourth Amendment of the United States Constitution; (2) any and all

---

[1] A superceding indictment was filed on September 20, 2004 against both defendant and another individual with charges unchanged from the original indictment.

statements made by defendant prior to and after defendant's arrest upon the grounds that such statements were obtained in violation of the rights afforded to defendant by the Fourth and Fifth Amendments of the United States Constitution; and (3) the pretrial and in-court identifications by the two couriers because the pretrial police identification procedure was so unduly suggestive that it tainted the in-court identification. A hearing on the motion to suppress the evidence was held on March 24, 2005. I conclude that defendant's constitutional rights were not violated by the conduct of the agents and recommend that defendant's motion be denied in its entirety.

I.    **FACTS**

On or about April 17, 2004, Vidal Benvenutti and Olga Bacallao (collectively "couriers") were informed by a third-party that an individual, later identified by the couriers as Hungria Camacho ("defendant") and known to them as "Moreno", had arranged for them to smuggle drugs into the United States from the Dominican Republic ("D.R."). See Hearing Tr., at 7:1-20; Govt. Mem. of Law, at 4. On or about April 19, 2004, Benvenutti and Bacallao went to an apartment in the Bronx to meet with defendant to discuss the trip. See Hearing Tr., at 8:10-12; Govt. Mem. of Law, at 4. At the meeting, the defendant told the couriers they would be paid six-thousand dollars ($6,000) to smuggle cocaine concealed in packages of coffee into the United States. See Hearing Tr., at 6:21-25; 5:17-21.

On or about April 27, 2004, defendant's sister Zoila Camacho delivered the necessary plane tickets to the couriers. The couriers departed for the D.R. on April 28, 2004 and Bacallao returned to the United States via John F. Kennedy International Airport ("JFK") on May 8, 2004. (Hearing Tr., at 25:9-14; Govt. Mem. of Law, at 4). After clearing customs at JFK, Bacallao

was picked up by the defendant at the American Airlines terminal and driven to an address in upper Manhattan. (Hearing Tr., at 26:2-12). Defendant took the cocaine from Bacallao and went inside the building for some time and upon returning drove Bacallao to her home. Id.

On May 9, 2004, Benvenutti arrived at JFK on an American Airlines flight from the D.R., but unlike Bacallao, Benvenutti was searched and inspectors found over two kilograms of cocaine in his luggage. See Hearing Tr., at 4:9-22; 5:17-21. Benvenutti admitted to knowingly smuggling drugs to Immigration and Customs Enforcement ("ICE") agents after being arrested. Id., at 6:21-25; 7:1-4. Benvenutti also told the ICE agents that he had been recruited by a person whom he knew as "Moreno", later identified as the defendant. Id., at 7:5-18. Benvenutti told the ICE agents that he was supposed to meet the defendant at the airport and that he could identify the defendant by sight, although he had no contact information for the defendant. Id., at 7:1-25; 8:1-25. Benvenutti described the defendant as follows: "an Hispanic male, mid-30s, 5'8", 170 to 180 pounds, short dark hair, and a sloppy dresser." (Hearing Tr., at 7:24-25; 8:1-2).

Based upon Benvenutti's description, two ICE agents, one male and one female, proceeded to the American Airlines terminal where they identified a person fitting the description. See Hearing Tr., at 13:1-4;13-19. The agents watched the defendant, who they described as appearing nervous. Id., at 69:20-25;70:1-25. The agents took particular notice of the fact that defendant had a cellular phone, but chose to make several phone calls from a pay phone, and even responded to a pager message by using the payphone. Id., at 70:10-15. Finally, after watching the defendant for approximately ten minutes, the agents approached the defendant and identified themselves as law enforcement officials. Id., at 69:23-25; 73:4-14. The defendant told the agents he did not speak English very well so one of the agents, who was competent in

3

conversational Spanish, acted as a translator between the other agent and the defendant. (Hearing Tr., at 76:13-78:6). The agents, asked the defendant why he was at the airport and defendant responded that he was there to pick up his aunt who was to arrive from Santo Domingo, Dominican Republic. Id., at 15:25-16:7. According to the agents no weapons were displayed or show of force made during this questioning. Id., at 83:16-17. Upon further questioning, it was discovered that defendant was unable to provide any specifics about his aunt, including the aunt's name, and instead provided the agents with three different first names for the aunt. Id., at 15:25-16:7; 80:18-81:2. When questioned again, defendant proceeded to tell the agents that he was there to pick up his uncle, whom he was also unable to name. (Hearing Tr., at 80:18-81:2). After two to three more minutes of speaking to the defendant, the agents asked the defendant if he would voluntarily accompany them into the secondary Customs area. Id., at 82:3-83:11. During this conversation, the agents at no time displayed their weapons, threatened the use of force against the defendant, or told him that he was required to answer the questions or to accompany them. Id., at 83:12-22.

The agents then led the defendant into the secondary Customs area, where Benvenutti readily identified the defendant as the drug-smuggling recruiter. (Hearing Tr., at 16:17-25; 115:16-17). The defendant was placed under arrest. Id., at 17:16-21. After being arrested, defendant was quickly transported into a private area of the airport where he was searched, given his Miranda rights in Spanish, and signed a waiver written in Spanish agreeing to speak with the agents. Id., at 17:22-21:13; 22:12-24:3; 55:17-57:15.

On May 12, 2004, Benvenutti appeared in court for a detention hearing, with his wife Bacallao present in the courthouse. (Hearing Tr., at 25:2-8; 26:13-15; 27:4-15). At that time, the

4

ICE agents only knew that Bacallao had gone to the D.R. with her husband at the same time but did not have a confirmed belief that Bacallao had smuggled drugs into the United States. Id., at 25:1-8. Based on this information, two agents interviewed Bacallao outside of the courtroom and Bacallao proceeded to talk and admit that she had also smuggled drugs into the country. Id., at 25:1-14. Bacallao described her meeting with defendant as well as the details of the smuggling trip. Id., at 25:1-26:25. She specified that the defendant picked her up at JFK on May 8, 2004 and took the drugs from her that day. (Hearing Tr., at 25:9-26:8). Bacallao then identified the defendant from a photographic array of six Hispanic males with short, dark hair, each in their 20s or 30s, and subsequently signed the array to confirm her identification of defendant. Id., at 28:1-31-25.

## II.   DISCUSSION

### A.   Custodial Interrogation

1.   The Investigatory Stop in the Airport Lobby was Initially Lawful

The government argues that the customs agents had a lawful basis to approach and speak to the defendant, while defendant contends that he was forcibly detained in violation of his Fourth Amendment rights. It is well settled law that not all conversations and contact between a police officer and an individual constitute "seizures" of a person under the Fourth Amendment. See INS v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762 (1984)(stating, "[t]he Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'")(citations omitted); see, also e.g., United States v. Mendenhall,

5

446 U.S. 544, 553-54, 100 S.Ct. 1870, 1876-77 (1980)(op. of Stewart, J.)(same); Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879 (1969)("Obviously, not all personal intercourse between policemen and citizens involve 'seizures' of persons."); United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990)("Not every encounter between a police officer and an individual is a seizure implicating the fourth amendment's protections."); People v. DeBour, 352 N.E. 2d 562, 569 (N.Y. 1976)("[T]he practical necessities of law enforcement and the obvious fact that any person in our society may approach any other person and attempt to strike up a conversation, make it clear that the police have the authority to approach civilians.").

Here, defendant argues that the decision to stop him initially in the airport lobby was an unlawful "investigative stop." (Def. Mem. of Law, at 3). The Supreme Court in U.S. v. Sokolow, 490 U.S. 1,7 (1989), referring to and quoting Terry v. Ohio, 392 U.S. 1, 30 (1968), stated, "we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'might be afoot,' even if the officer lacks probable cause." However, an investigative stop violates the Fourth Amendment when the stop is made without any "specific, objective and articulable facts giving rise to a reasonable suspicion that the suspect is, was, or is about to be engaged in criminal activity." United States v. Nargi, 732 F.2d 1102, 1105 (2d Cir. 1984); see also Terry v. Ohio, 392 U.S. 30 (1968). However, reasonable suspicion entails only a "minimal level of objective justification" and it is "something more than an inchoate and unparticularized suspicion or 'hunch', but less than the level of suspicion required for probable cause." See U.S. v. Sokolow, 490 U.S. 7 (1989); United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582 (1975)("Reasonable suspicion" exists when law enforcement officials are "aware of specific

articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion."); United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995)(stating that reasonable suspicion is measured by an objective test using the experience and perspective of a trained law enforcement official.). The test for reasonable suspicion is a rather loose and minimal standard. See United States v. Santana, 485 F.2d 365, 368 (2d Cir. 1973); see also United States v. Oates, 560 F.2d 45, 63 (2d Cir. 1977)(the court held that the standard is "not a difficult one to satisfy"). The case law also recognizes that nervous and evasive behavior is a relevant factor in determining whether or not reasonable suspicion exists. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 676 (2000)("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.", citing Sokolow, 490 U.S. at 8-9; Brignoni-Ponce, 422 U.S. at 885; Florida v. Rodriguez, 469 U.S. 1, 6, 105 S.Ct. 308, 310-11 (1984) (*per curiam*).

Here, defendant argues that the ICE agents' decision to stop defendant and question him was not based on "specific, objective and articulable facts giving rise to a reasonable suspicion." Specifically, the defendant argues that: (1) the activity the ICE agents "observed with regard to him was totally innocuous" and not sufficient to give rise to suspicion; (2) the description supplied by Benvenutti and used by the agents to stop the defendant was not specific enough nor matched defendant; and (3) the agents stopped defendant without having knowledge of defendant's actual name, and only knowing of a person referred to as "Moreno." (Def. Mem. of Law, at 3-4).

However, as seen in this case, even without having a basis for suspicion, an officer may ask an individual for his identification and ask him questions, as long as the officer does not

convey to the individual that compliance is required. See, e.g., Thompson, 941 F. 2d at 69. For example, in United States v. Mendenhall, 446 U.S. 544 (1980), which also involved the questioning of a suspect in an airport lobby, the law enforcement officers approached defendant in plain clothes, identified themselves as federal agents, and displayed no weapons. Id. at 555. The Supreme Court held that the law enforcement official's questioning of the defendant about her identification and address, and about the length of time the defendant had been in California did not constitute an unlawful investigatory stop. Id. The case law holds that this type of procedure, particularly in an airport, is lawful and not a seizure under the Fourth Amendment, and does not require a showing of reasonable suspicion.

In the instant case, reasonable suspicion did exist at the time the two ICE agents stopped the defendant in the airport lobby. Here, the agents had just arrested a courier carrying over two kilograms of cocaine, who told them that he had been instructed to meet the recruiter, the defendant, in the airport lobby area after passing through Customs. (Hearing Tr., at 5:16-22; 6:20-7:21). In addition, the courier gave the agents a detailed description of the recruiter as an Hispanic male, approximately 5'8" or 5'9", approximately 180-190 pounds, in his mid-30s, with short dark hair and who was a sloppy dresser. Id., at 7:23-8:2. The defendant is in fact an Hispanic male fitting those approximations. Further, while defendant notes that there were numerous other people in the American Airlines lobby, it was unlikely that there were a significant number of people fitting that description at that time and in that location. Id., at 79:9-18; 90:12-21. Finally, aside from Benvenutti's description, defendant's "nervous and evasive" behavior gave the agents additional reason to suspect him. Relying upon Benvenutti's description, the agents observed the defendant for approximately ten minutes

8

before actually approaching him. (Hearing Tr., at 69:23-25; 73:4-14). The ICE agents approached him only after noticing his "odd" behavior of making several phone calls from a pay phone despite carrying a cell phone. Thus, based upon Benvenutti's description and their own personal observations and experiences, the agents approached the defendant and questioned him. I find that these actions were based upon reasonable suspicion and that there was no seizure of the person for Fourth Amendment purposes. Further, even if the agents did not have reasonable suspicion initially, the agents "quickly gained it through defendant's evasive answers" to the agents "lawful inquiries" about the purpose of his presence at the airport and the identification of his aunt and uncle. See Govt. Mem. of Law, at 17; see also United States v. Mendenhall, 446 U.S. 555 (1980) (holding that the law enforcement official's questioning of the defendant about her identification and address, and about the length of time the defendant had been in California did not constitute an investigatory stop). Finally, it was only after defendant gave the agents his "evasive non-responses" that the agents asked him to accompany them to the secondary Customs area. Once, there, it was only after Benvenutti positively identified the defendant that he was arrested.

2. Defendant's Lawful Arrest

a. Investigatory Stop did not convert to a *De Facto* Arrest

Defendant also argues that even if the investigatory stop was permissible, thereafter it turned into an unlawful arrest, and therefore defendant's initial statements should be suppressed as fruits of an illegal detention and questioning. (Def. Mem. of Law, at 8). As was discussed earlier, I find that the agents had reasonable suspicion for the initial approach and questioning of defendant. Thus, the question to be answered is whether the investigatory stop, including taking

9

the defendant to the secondary Customs area, turned into an unlawful arrest and was not "reasonably related in scope to the justification for [its] initiation." See United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995)(quoting United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975). An investigatory stop may turn into an unlawful arrest if the methods used by the law enforcement officials were more intrusive than necessary or if the investigatory stop continues for too long. See, e.g., United States v. Perea, 986 F.2d 633, 634 (2d Cir. 1993); United States v. Glover, 957 F.2d 1004, 1011 (2d Cir. 1992); Posr v. Doherty, 944 F.2d 91 (2d Cir. 1991). In determining whether or not the investigatory stop has turned into a *de facto* arrest the Court must look "to the amount of force used by the police, the need for such force, and the extent to which the individual's freedom of movement was restrained." United States v. Perea, 986 F.2d at 645. The Court also looks to see whether the "target of the stop was suspected of being armed." Id. at 645. For example, in Tehrani, the Court upheld a thirty-minute detention, prior to defendant's arrest, during which time the defendant was escorted from an airport lobby to a private area. United States v. Tehrani, 49 F.3d at 61 (1995). The Court found that because the agents "made speedy and appropriate inquiries in a reasonably way" the detention was not excessive as to convert into a *de facto* arrest and that the agents conduct was reasonable and did not constitute seizure. Id.

Here, defendant's detention from the time he was first approached by the agents to the time he was identified by Benvenutti and arrested in the customs area was approximately twelve minutes. (Hearing Tr., at 69:23-25; 73:4-14; 82:3-83:11; 17:16-21). In fact, it appears that little time was wasted by the agents during this period as the defendant was arrested immediately upon his appearance in the private customs area where he was quickly identified as the recruiter by

10

Benvenutti. Id., at 16:17-25; 115:16-17. Additionally, the agents did not use any excessive force in stopping and questioning the defendant nor did it appear that the defendant's freedom of movement was restrained in any unreasonable way at the time the investigatory stop was initiated by the agents. Also, there were only two agents who initially questioned the defendant and the investigatory stop took place in a very public airport lobby.

The agents' subsequent request of defendant to accompany them out of the lobby was also reasonable considering the circumstances, the agents' experiences with similar situations and considering the defendant's evasive behavior and non-responses to the agents' questioning. Further, the defendant agreed to accompany the agents voluntarily. Similar to the facts in U.S. v Mendenhall, the defendant here was not told that he "had to go to the office, but was simply asked if [he] would accompany the officers. There were neither threats nor any show of force. The [defendant] had been questioned only briefly..." 446 U.S. at 557-58. Here, the defendant clearly and voluntarily agreed to the agents' request to accompany them out of the public lobby space. Thus, following Tehrani, the "agents made speedy and appropriate inquiries in a reasonably way" and their conduct was lawful in scope and duration and was reasonably related to the justification for the agents' suspicion of the defendant. See United States v. Tehrani, 49 F.3d at 61 (1995); see also Govt. Mem. of Law, at 19. Therefore, I find that the investigative stop was proper and did not convert into a *de facto* arrest and that there is no basis for suppression of any evidence obtained subsequent to defendant's arrest. Further, I find that defendant's initial statements should not be suppressed as fruits of an illegal detention and questioning.

b.  Probable Cause did exist to Arrest defendant after Benvenutti Identification

Nevertheless, the government contends that the agents had probable cause to arrest the defendant even in the airport lobby. I do not agree. I find probable cause to arrest did not exist until Benvenutti identified the defendant at the show-up in the secondary Customs area. The agents thus acted properly by arresting defendant at that time. As discussed above, the agents had made a proper investigatory stop of the defendant in the airport lobby and defendant's subsequent detention in the secondary Customs area was reasonable under the circumstances. Therefore, defendant's ultimate arrest, after agents gained probable cause, was proper under the circumstances.

Probable cause to arrest exists when agents have "the facts and circumstances within their knowledge...of which they had [] reasonabl[e] trustworthy information...sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964). See also United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990) ("Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested."). Probable cause is also to be viewed from the perspective of the law enforcement officers. See United States v. Cruz, 834 F.2d 47, 51 (2d Cir. 1987). However, establishing probable cause to arrest does not require the government to make a *"prima facie"* showing of criminal activity or even "demonstrate that it is more probable than not that a crime has been or is being committed." See Govt. Mem. of Law, at 20 (citing Cruz, 834 F.2d at 50; United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983).

12

Here, as discussed *supra*, the agents had sufficient reasonable suspicion to make an investigatory stop of defendant based upon Benvenutti's description of defendant and defendant's evasive behavior in the airport lobby. Additionally, as discussed *supra*, the investigatory stop was not unreasonable in duration or extent to justify it turning into a *de facto* arrest. Thus, considering the totality of the circumstances, as the agents' experiences with similar cases, Benvenutti's description of defendant to the agents in the secondary Customs area prior to the investigatory stop, defendant's evasive behavior and unclear responses to the agents' questioning in the airport lobby, and Benvenutti's positive identification of the defendant at the show-up it is clear that the agents had probable cause to arrest the defendant at that time. Thus, I find that defendant's arrest was lawful.

3. Miranda Warnings were Proper

Defendant argues that all statements should be suppressed because the arresting officer failed to issue proper Miranda warnings. A suspect is entitled to Miranda warnings when subjected to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Custody "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2148 (2004). The importance of proper Miranda warnings is to protect the rights of the defendant by "...dispel[ling] the compulsion inherent in custodial surroundings...so that the suspect can exercise the privilege against self-incrimination." Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682 (1980); Miranda v. Arizona, 384 U.S. at 458 (1967). For the reasons

13

discussed *supra*, I find there was no custodial interrogation prior to defendant's arrest. Therefore any statements made prior to the formal arrest are admissible. However, the inquiry is whether defendant's statements made after the arrest are admissible. Specifically, the defendant contends that proper Miranda warnings were not administered and therefore all statements made subsequent to the arrest should be suppressed.

Here, Miranda warnings were administered to the defendant after he was arrested. After his arrest in the airport Customs area, the defendant was removed to a private office within the airport. The defendant was searched and given his Miranda rights in Spanish by the arresting officer via an interpreter. See Hearing Tr., at 17:22-21:13; 22:12-24:3; 55:17-57:15. Defendant indicated to the agent that he understood the warning and would agree to speak to the agent. Defendant was then given a waiver form written in Spanish where he also agreed to speak to the agents. Id. Defendant told the agent and interpreter he could read in Spanish and defendant appeared to the agent to have read the entire waiver and marked yes to both his understanding of the waiver form and his rights and as to his agreement to talk with the agents. (Hearing Transcript, at 115:1-11). Defendant then signed the form. Thus, I find that sufficient and proper Miranda warnings were given, that defendant waived his rights voluntarily, knowingly and intelligently and as such all statements made subsequent to the arrest are admissible.

**B.    Identification Procedures**

1.    Photographic Array was not Unduly Suggestive

Defendant moves to suppress Bacallao's identification on May 12, 2004 citing the photographic array as unduly suggestive. As a result, defendant further moves to suppress any

testimony concerning that identification and any related in-court identification. (Govt. Mem. of Law, at 23; Def. Mem. of Law, at 10). A defendant's right to due process includes the right not to be the subject of suggestive police identification procedures which could create a substantial likelihood for misidentification. Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381-82 (1972). Here, the defendant contests the integrity of the photographic array used by Bacallao to identify the defendant. The undue suggestiveness of a photographic array depends on various factors including the array's contents and the manner of presentation such that the accused is suggested to be the culprit to the identifying witness more than the other persons in the array. United States v. Bennett, 409 F.2d 888, 898 (2d Cir. 1968); United States v. Archibald, 734 F.2d 938, 940 (2d Cir. 1984); Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986). The defendant argues that the photographic array shown to Bacallao was prejudicial because the defendant's photograph appeared to "be much lighter and older than the others." However, defendant does not argue that the photographic array was "inherently prejudicial." See Govt. Mem. of Law, at 23 (citing United States v. Rosa, 11 F.3d 315, 330 (2d Cir. 1993). Upon my review of the photographic array, I do not find the array to be either "inherently prejudicial" or "unduly suggestive" in any way. The physical characteristics of all six individuals pictured in the array appear to be similar enough not to be considered suggestive in any way. They were all Hispanic males in their 20s or 30s, where defendant is 33 years old. The six individuals also all have short dark hair similar to the defendant. Finally, the only marked variation among the six individuals is some difference in skin-tone. However, I find that this difference is not significant enough to suggest any amount of prejudice toward the defendant. Morever, because Bacallao had sufficient prior personal contact

15

with the defendant she would have been able to simply identify the defendant from a single photograph of the defendant. (Hearing Tr., at 116:5-18). Therefore, the agents only exercised prudence in showing Bacallao the photographic array.

The defendant further argues that he was prejudiced because neither he nor his counsel was present to observe the manner in which the photo array was displayed to the witness.[2] (Def. Mem. of Law, at 11). Where a photographic identification procedure is so suggestive as to lead to a substantial likelihood of irreparable misidentification, the government bears the burden of proving that the in-court identification will not be unduly tainted by the suggestive array based on the totality of the circumstances. See Manson v. Braithwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977); see also Neil v. Biggers, 409 U.S. at 199-200. However, the Supreme Court also has held that an in-court identification will be barred "only if the photographic identification procedure was impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). The Supreme Court in Neil v. Biggers considered a number of factors in determining the appropriateness of an in-court identification including the opportunity for the witness to observe the accused, the accuracy of the witness' prior description of the accused and the length of time passed between the witness' personal observation of the accused and the identification procedure. 409 U.S. at 199-200. Here, Bacallao met with the defendant at an apartment to discuss the drug

---

[2] See United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992)(Similarly important is the manner in which the array is presented, for the conduct of the presenting officers may also unfairly suggest to the viewing witness that the accused is the person who should be selected.). See also United States v. Jarvis, 560 F.2d 494, 499-500 (2d Cir. 1977)(The conduct may so unfairly taint the procedure as to coerce the witness into identifying the subject based upon the police suggestion rather than upon the person's memory of the event.).

16

smuggling and she again met with the defendant when she delivered the cocaine to him. Additionally, Bacallao immediately identified the defendant from the photographic array only four days after last seeing the defendant without hesitation. On this record, I find that Bacallao had ample opportunity and personal experience with the defendant to make an accurate identification during the photographic array and to overcome any concerns of undue suggestion or taint by the agents. Thus, Bacallao's in-court identification is independently reliable and should not be barred at trial.

2. The Show-up Identification by Benvenutti was Proper

Generally, show-up identification procedures are disfavored by the courts. Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972 (1967). However, show-up procedures are permitted under extenuating circumstances where necessary. United States v. Concepcion, 983 F.2d 369, 377-78 (2d Cir. 1992). A show-up procedure may be appropriate when a suspect has just been detained and police show the suspect to an eye witness in order to determine whether or not they have detained the appropriate person. See Govt. Mem. of Law, at 26 (citing as examples, United States v. Brown, 1995 WL 464956, at *4 (S.D.N.Y. Aug. 7, 1995; Styles v. Van Zandt, 1995 WL 326445, *4 (S.D.N.Y. May 31, 1995)). The Second Circuit in Chavis v. Henderson has even supported this use of a show-up procedure has being consistent with good police work. 638 F.2d 534, 537 (2d Cir. 1980) (holding that identification of defendant made by victim while defendant was sitting in police car with uniformed officer was reliable for due process purposes considering victim's interest in defendant's identity and brief lapse of time between victim's initial observation of defendant and identification).

Here, the agents had just questioned and arrested Benvenutti with over two kilograms of

17

cocaine and Benvenutti stated that he was to meet the defendant in the airport lobby. Then, based upon Benvenutti's detailed physical description and subsequent identification of defendant as well as defendant's nervous behavior in the lobby, the agents arrested defendant. Based on these circumstances, I find that it was appropriate law enforcement procedure to administer the show-up procedure to confirm defendant's identity as Benvenutti's drug recruiter. Moreover, the propriety of the show-up procedure is buttressed by the fact that Benvenutti had met with the recruiter prior to the airport detention and thus had a clear image of defendant's identity.[3] Given Benvenutti's prior personal knowledge of and contact with defendant, there is no reason that Benvenutti's in-court identification of defendant would not be independently reliable. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

## III. CONCLUSION

For the above reasons, I respectfully recommend that defendant's motion be denied in its entirety. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1) (2000); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: Brooklyn, New York
June 3, 2005

s/Joan M. Azrack
_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

---

[3] Like Bacallao, Benvenutti had met with defendant at an apartment to discuss the drug smuggling trip. Although the airport show-up too place almost three weeks after this contact, Benvenutti's prior contact with defendant was sufficient to overcome any notions of undue suggestion by the show-up or the law enforcement officials.